PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MEHDI NOOHI, individually and on behalf of all others similarly situated; SOHEYLA BOLOURI, individually and on behalf of all others similarly situated,

*Plaintiffs-Appellees,*

v.

TOLL BROS., INC., for itself and all others similarly situated; TOLL LAND CORP. NO. 43, for itself and all others similarly situated; TOLL MD V LIMITED PARTNERSHIP, for itself and all others similarly situated,

*Defendants-Appellants.*

No. 12-1261

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Richard D. Bennett, District Judge.
(1:11-cv-00585-RDB)

Argued: December 4, 2012

Decided: February 26, 2013

Before KING, SHEDD, and DAVIS, Circuit Judges.

Affirmed by published opinion. Judge Davis wrote the opinion, in which Judge King and Judge Shedd joined.

**COUNSEL**

**ARGUED:** Quincy Montgomery Crawford, III, DLA PIPER US LLP, Baltimore, Maryland, for Appellants. Tillman Finley, MARINO LAW PLLC, Washington, D.C., for Appellees. **ON BRIEF:** James D. Mathias, DLA PIPER US LLP, Baltimore, Maryland, for Appellants. Daniel Marino, MARINO LAW PLLC, Washington, D.C., for Appellees.

---

**OPINION**

DAVIS, Circuit Judge:

In this putative class action, prospective luxury home buyers allege that a real estate development company unlawfully refused to return deposits when the prospective buyers could not obtain mortgage financing. The named Plaintiffs-Appellees are Mehdi Noohi and Soheyla Bolouri ("Plaintiffs"), a husband and wife; Defendants-Appellants are Toll Bros., Inc., a real estate development company, and several of its subsidiaries (collectively, "Toll Brothers"). Plaintiffs contracted with a subsidiary of Toll Bros., Inc., for the construction of a luxury home in Maryland. The Agreement of Sale ("the Agreement") required that Plaintiffs seek approval of a mortgage, and included an arbitration provision. Though Plaintiffs received a "Mortgage Loan Commitment" letter from at least one lender that was later rescinded, and though several other of their mortgage applications were all denied, Toll Brothers sought to keep $77,008 in Plaintiffs' deposits.

Plaintiffs sued Toll Brothers individually and on behalf of a class of other prospective buyers who allegedly lost deposits to Toll Brothers in a similar manner. The district court denied Toll Brothers' motion to dismiss or stay the suit pending arbitration, finding that the Agreement's arbitration provision

lacked mutuality of consideration under Maryland law because it required only the buyer—but not the seller—to submit disputes to arbitration. Toll Brothers appealed.

For the reasons that follow, we hold that this appeal is properly before us under 9 U.S.C. § 16(a), and that the Agreement's arbitration provision is unenforceable for lack of mutual consideration under Maryland law.

I.

We begin by setting out the facts Plaintiffs have alleged, which we take as true for purposes of this appeal, *see Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540, 543 (4th Cir. 2005), although "the decision to deny [a] motion for stay and to compel arbitration is reviewed de novo," *Patten Grading & Paving, Inc. v. Skanska USA Bldg., Inc.*, 380 F.3d 200, 204 (4th Cir. 2004) (citing *MicroStrategy, Inc. v. Lauricia*, 268 F.3d 244, 250 (4th Cir. 2001)). *See also Johnson v. Circuit City Stores*, 148 F.3d 373, 377 (4th Cir. 1998).

A.

Toll Brothers, a publicly traded real estate development company, sells luxury residences in a number of states, including Maryland. One of Toll Brothers' subsidiaries, TBI Mortgage Company ("TBI Mortgage"), provides mortgage banking primarily to buyers of Toll Brothers homes. Other subsidiaries contract with individual home buyers for the purchase of newly constructed or planned homes. One such subsidiary, Toll Land Corp. No. 43, is the General Partner in Toll MD V Limited Partnership, with whom Plaintiffs contracted to purchase a home.

On February 17, 2008, Plaintiffs made an "initial reservation deposit" of $5,000. On February 24, 2008, they entered into the Agreement with Toll MD V to purchase a preconstruction home in Glenelg, Maryland, for $1,006,975. Plain-

tiffs made an additional deposit of $45,348 and later deposited another $26,660. By February 28, 2008, the deposit total had reached $77,008.

The Agreement contained a number of relevant provisions. Section 2 of the Agreement provided that Toll Brothers would hold the deposit until it was either refunded or forfeited by Plaintiffs. Section 4 dealt with mortgage application obligations, and directed Plaintiffs to complete the mortgage approval process within 60 days. In order to do so, Plaintiffs agreed to make a good-faith, "truthful and complete application to TBI Mortgage and any other lender of [their] choosing," accept a loan commitment, and comply with all terms imposed by the lender. Compl. ¶ 35; J.A. 49.[1] Plaintiffs agreed "to be responsible for and bear the risk of meeting all terms and conditions" of the loan commitment, and the Agreement further provided that "the termination or expiration of the mortgage commitment after it is received, for any reason, shall not release [them] of [their] obligations under the Agreement." J.A. 49. If Plaintiffs were not approved for a mortgage after 60 days, Toll Brothers could either extend the mortgage application period in order to submit a mortgage request on behalf of Plaintiffs, or declare the Agreement "null and void" and refund Plaintiffs their deposit. Compl. ¶ 36; J.A. 49. Section 13 of the Agreement comprised an arbitration provision, and Plaintiffs initialed under each of its paragraphs.

Plaintiffs applied to TBI Mortgage on February 25, 2008, but their application was rejected. On Toll Brothers' recommendation, Plaintiffs then applied for a mortgage with First Preferred Financial, Inc., which provided them with a "Mortgage Loan Commitment" letter for $906,275 on April 24, 2008. Though Plaintiffs accepted the letter, First Preferred Financial informed Plaintiffs on June 13, 2008, that it could no longer provide them with financing in light of a recent

---

[1]Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

Maryland law prohibiting "stated income" loans. Plaintiffs also sought to secure a mortgage from GMAC, but were unsuccessful.

On July 24, 2008, Plaintiffs sent a letter to Toll Brothers, informing them that they were unable to secure a mortgage, and demanding a refund of their deposit pursuant to the Agreement of Sale. On August 21, 2008, Toll Brothers responded to Plaintiffs by asserting that the First Preferred Financial commitment letter, although now terminated, had satisfied the mortgage contingency and Plaintiffs were still obligated to perform under the Agreement. The response further stated that Toll Brothers would retain Plaintiffs' deposit if they did not submit additional mortgage applications and proceed to closing. Specifically, the letter suggested that Plaintiffs contact APEX Funding Group.

On August 27, 2008, Plaintiffs wrote to Toll Brothers, stating that they would continue to work to receive a mortgage. On September 22, 2008, APEX Funding Group gave Plaintiffs a loan commitment letter but then declined to approve them for a mortgage. Plaintiffs also sought mortgage approvals from other lenders, but were unable to secure financing.

Plaintiffs further allege that Toll Brothers has neither begun construction on the lot in question, nor incurred expenses toward the construction of the home. Plaintiffs claim that because Toll Brothers refused to refund their deposits after the failure of their repeated good-faith attempts to secure a mortgage, Toll Brothers breached the Agreement.

B.

Plaintiffs sued, filing a class action complaint against Toll Brothers on March 3, 2011, on behalf of themselves and home buyers around the country who they alleged lost their deposits in a similar manner. Federal jurisdiction was founded on the Class Action Fairness Act; the complaint asserted an amount

in controversy of over $5 million, and at least one member of the putative class is a citizen of a different state from one of the defendants. *See* 28 U.S.C. § 1332(d)(2). The complaint contained four causes of action: (1) breach of contract; (2) breach of the duty of good faith and fair dealing; (3) unjust enrichment; and (4) unfair and deceptive trade practices, in violation of Md. Code Ann., Commercial Law § 13-301 *et seq.*

Toll Brothers filed a motion to dismiss or stay Plaintiffs' complaint pending arbitration based on the Agreement's arbitration provision, Section 13. After a hearing, the district court issued an order and memorandum opinion denying the motion. *See Noohi v. Toll Bros., Inc.*, 2012 WL 273891 (D. Md. Jan. 30, 2012). The court noted that state contract formation law determines the validity of arbitration agreements, and that under Maryland law as articulated in *Cheek v. United Healthcare of Mid-Atlantic, Inc.*, 835 A.2d 656 (Md. 2003), an arbitration provision is treated as a severable contract that must be supported by adequate consideration. After determining that the arbitration provision required only Plaintiffs—but not Toll Brothers—to submit disputes to arbitration, the court relied on *Cheek* to hold that Section 13 of the Agreement was unenforceable for lack of consideration. The court did not, however, address the possibility that the rule set forth in *Cheek* was preempted under *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011), which held that the Federal Arbitration Act ("FAA") preempted California's judicial rule regarding the unconscionability of class arbitration waivers in consumer contracts. Toll Brothers appealed.

## II.

Plaintiffs first argue that we lack jurisdiction over this interlocutory appeal from the district court's denial of Toll Brothers' motion to dismiss or stay pending arbitration.

As we recently reiterated, "[c]ourts of appeal ordinarily may review only final decisions of district courts." *Rota-*

*McLarty v. Santander Consumer USA, Inc.*, 700 F.3d 690, 696 (4th Cir. 2012). *See also* 28 U.S.C. § 1291. "Although [a] district court's order denying [a] motion to compel arbitration and stay proceedings is not a final decision, we may nevertheless exercise appellate jurisdiction if the order falls within an exception to the final judgment rule established by the FAA." *Rota-McLarty*, 700 F.3d at 696.

Under the FAA, courts must stay any suit "referable to arbitration" under an arbitration agreement, where the court has determined that the agreement so provides, and one of the parties has sought to stay the action. 9 U.S.C. § 3. Under 9 U.S.C. § 16(a)(1)(A), an "appeal may be taken from" an order "refusing a stay of any action under" 9 U.S.C. § 3. In short, a party may appeal the denial of a motion to stay an action concerning a matter that a written agreement has committed to arbitration. *See Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 86 (2000) (holding that § 16(a)(3) "preserves immediate appeal of any 'final decision with respect to an arbitration,' regardless of whether the decision is favorable or hostile to arbitration"). *See also Am. Cas. Co. of Reading, Pa. v. L-J, Inc.*, 35 F.3d 133, 135 (4th Cir. 1994) (abrogated on other grounds by *Green Tree*, 531 U.S. at 89).

Plaintiffs acknowledge the above principles but argue that because Toll Brothers' motion was primarily a motion to dismiss, and a motion to dismiss is not an appealable "final decision," § 16(a)(1)(A) is inapplicable. In other words, according to Plaintiffs, for Toll Brothers' motion to be immediately appealable, the motion must seek only a stay.

This overly formal argument fails for at least two reasons. First, Toll Brothers moved "to dismiss *or stay*," not simply to dismiss. *See* Defs.' Mem. in Supp. of Mot. to Dismiss or Stay Pls.' Compl. Pending Arbitration at 1 (hereinafter, "Defs.' Mot. to Dismiss or Stay") (emphasis added); J.A. 35. The motion's conclusion specifically requested that the court "dismiss, or in the alternative stay, Plaintiffs' Complaint pending

arbitration between Plaintiffs and Defendants." Defs.' Mot. to Dismiss or Stay at 11; J.A. 45. As noted above, under § 16(a)(1)(A), a party may appeal the denial of a motion to stay federal proceedings pending arbitration; at least to the extent that an appeal concerns the denial of a motion to stay, the fact that the motion also seeks dismissal does not affect its appealability.

Second, in assessing whether a motion adequately invoked the FAA, "the proper inquiry focuses on substance rather than nomenclature." *Rota-McLarty*, 700 F.3d at 698. Thus, "we look to whether a motion evidences a clear intention to seek enforcement of an arbitration clause rather than on whether it adhered to a specific form or explicitly referenced §§ 3 or 4." *Id.* Though Toll Brothers never sought to have the district court compel arbitration, its entire brief focused on the enforceability of the arbitration provision. Toll Brothers thus indicated a "clear intention to seek enforcement" of that provision.[2]

---

[2]In *Choice Hotels International, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709-10 (4th Cir. 2001), we held that "[n]otwithstanding the terms of § 3, . . . dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable." In *Hooters of America, Inc. v. Phillips*, 173 F.3d 933, 937 (4th Cir. 1999), however, we had previously noted that "[w]hen a valid agreement to arbitrate exists between the parties and covers the matter in dispute, the FAA commands the federal courts to stay any ongoing judicial proceedings, 9 U.S.C. § 3, and to compel arbitration, *id.* § 4." As we recently pointed out, "[t]here may be some tension between our decision in *Hooters*—indicating that a stay is required when the arbitration agreement 'covers the matter in dispute'—and *Choice Hotels*—sanctioning dismissal 'when all of the issues presented . . . are arbitrable.'" *Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 376 n.18 (4th Cir. 2012). In *Aggarao*, we went on to note that this potential tension mirrors a circuit split:

> Our sister circuits are divided on whether a district court has discretion to dismiss rather than stay an action subject to arbitration. *Compare Cont'l Cas. Co. v. Am. Nat'l Ins. Co.*, 417 F.3d 727, 732 n.7 (7th Cir. 2005) ("[T]he proper course of action when a party seeks to invoke an arbitration clause is to stay the proceed-

This Court therefore has jurisdiction over the instant appeal.

### III.

We next examine whether the district court correctly held that the arbitration provision in Section 13 of the Agreement was unenforceable for lack of mutual consideration under *Cheek*.

Toll Brothers makes the following arguments in support of its view that the court erred in so holding: (1) the arbitration provision was supported by the consideration underlying the Agreement as a whole; (2) the arbitration provision binds both parties to arbitration, and the district court failed to resolve ambiguities in favor of arbitration when it held otherwise; (3) *Cheek* is distinguishable on its facts; and (4) *Cheek* is inconsistent with the Supreme Court's holding in *Concepcion* because it singles out arbitration provisions by imposing on them a requirement inapplicable to other contract provisions.

Plaintiffs make the following arguments in support of the district court's holding: (1) under Maryland law, mutual consideration must exist in the arbitration provision itself; (2) the arbitration provision here unambiguously binds only Plaintiffs, leaving no ambiguities to interpret in favor of arbitra-

---

ings pending arbitration rather than to dismiss outright."), *with Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992) ("The weight of authority clearly supports dismissal of the case when all of the issues raised in the district court must be submitted to arbitration.").

*Aggarao*, 675 F.3d at 376 n.18. In *Aggarao*, however, we "need[ed] not resolve this disagreement" because the issues raised by the plaintiff were not *all* subject to arbitration, and thus dismissal was inappropriate. *Id.* Similarly here, Toll Brothers' motion was appealable irrespective of *Choice Hotels* for the reasons discussed above. We therefore again decline to "resolve this disagreement."

tion; (3) *Cheek*'s facts do not render it distinguishable; and (4) neither *Concepcion* nor other recent Supreme Court cases abrogate *Cheek*'s requirement that an arbitration provision contain mutual consideration. We think Plaintiffs have the more persuasive arguments.

A.

"We review de novo a district court's determination on arbitrability of a civil action." *Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 365 (4th Cir. 2012). "At the same time, we give due regard to the federal policy favoring arbitration and resolve 'any doubts concerning the scope of arbitrable issues . . . in favor of arbitration.'" *Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540, 543 (4th Cir. 2005) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

Section 2 of the FAA, its "primary substantive provision," *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24, makes agreements to arbitrate "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2.

> Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act.

*Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24. Under this federal substantive law, "courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms." *Concepcion*, 131 S. Ct. at 1745 (internal citations omitted).

However, § 2 also permits arbitration agreements to be declared unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "This saving clause permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Concepcion*, 131 S. Ct. at 1746 (citation omitted).

Applying the above framework, the Supreme Court has

> held that parties may agree to limit the issues subject to arbitration, *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 628 (1985), to arbitrate according to specific rules, [*Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)], and to limit *with whom* a party will arbitrate its disputes, [*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1773 (2010)].

*Concepcion*, 131 S. Ct. at 1748-49 (emphasis in original). In *Concepcion*, the Supreme Court further prohibited courts from altering otherwise valid arbitration agreements by applying the doctrine of unconscionability to eliminate a term barring classwide procedures. *Id.* at 1750-53.

The Maryland case at the center of this appeal is *Cheek v. United Healthcare of Mid-Atlantic, Inc.*, 835 A.2d 656 (Md. 2003). In *Cheek*, the plaintiff was presented with an offer of employment conditioned on acceptance of the employer's arbitration policy. *Id.* at 657-58. That policy left to the employer the unilateral right to "alter, amend, modify, or revoke the [p]olicy at its sole and absolute discretion at any time with or without notice." *Id.* at 658. The plaintiff accepted the offer of employment on the employer's terms, but was terminated about seven months later. *Id.* He then filed suit in

Maryland state court, alleging a number of state-law violations. *Id.* at 659. The employer filed a "Motion to Dismiss and/or Compel Arbitration and Stay" the suit, which the trial court granted. *Id.* The Court of Appeals of Maryland (which granted certiorari prior to any proceedings in the intermediate appellate court) agreed with the plaintiff's argument that the employer's unfettered discretion to change the arbitration agreement rendered its promise to arbitrate illusory, and that the agreement was therefore unenforceable for lack of consideration. *Id.* In reaching that conclusion, the court viewed the arbitration agreement as severable from the underlying employment relationship, and limited its assessment of consideration to the four corners of the agreement itself. *Id.* at 665.

## B.

## 1.

Toll Brothers' first argument is that the arbitration provision in the Agreement is enforceable because it was supported by the consideration underlying the Agreement as a whole. To assess that argument, we must first determine what law applies. "The Supreme Court has directed that we 'apply ordinary state-law principles that govern the formation of contracts'" when assessing whether the parties agreed to arbitrate a matter. *Hill*, 412 F.3d at 543 (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). *See also Rota-McLarty*, 700 F.3d at 699 ("The question of whether an enforceable arbitration agreement exists . . . is a matter of contract interpretation governed by state law, which we review de novo."). Maryland generally follows the "lex loci contractus" principle, under which "the law of the jurisdiction where the contract was made controls its validity and construction." *Kramer v. Bally's Park Place, Inc.*, 535 A.2d 466, 467 (Md. 1988). The Agreement was executed in Maryland between Toll Brothers' Maryland subsidiary—Toll MD V Limited Partnership—and Plaintiffs, who resided in Maryland

at the time it was executed. The Agreement also references numerous provisions of Maryland law. For example, Section 17 references the "Maryland Homeowners Association Act," Section 19 references "Section 8-402.2 of the Real Property Article of the Annotated Code of Maryland," and Section 20 references "§ 17-404 of the Business Occupations and Professions Article of the Annotated Code of Maryland." J.A. 52-53. We therefore look to Maryland law.

As already discussed, that law was set forth in *Cheek*. There, after a thorough analysis discussing cases that reached conflicting conclusions, Maryland's highest court specifically rejected the notion that consideration for an underlying contract can serve as consideration for an arbitration provision within that contract. *See Cheek*, 835 A.2d at 667 ("We disagree with cases from other jurisdictions that determine that consideration for an underlying contract also can serve as consideration for an arbitration agreement within the contract, even when the arbitration agreement is drafted so that one party is absolutely bound to arbitrate all disputes, but the other party has the sole discretion to amend, modify, or completely revok[e] the arbitration agreement at any time and for any reason."). The court reasoned that to do otherwise would require "straying into the prohibited morass of the merits of the claims" by looking to the parties' obligations (and their potential breach) underlying the lawsuit itself. *Id.* at 665. That merits inquiry "could eclipse the role of the arbitrator, should a valid agreement exist, and therefore run afoul of strong Federal and Maryland policies favoring arbitration as a viable method of dispute resolution." *Id.* at 668. In other words, where it is asserted that a dispute is bound to arbitration, the role of courts is limited to determining the enforceability of an arbitration provision; "straying" into areas outside that provision is an impermissible encroachment on the arbitrator's authority. *Cf. Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967) (holding that courts may adjudicate claims of "fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the

agreement to arbitrate"—but may not "consider claims of fraud in the inducement of the contract generally").

There are two published Fourth Circuit cases that cite *Cheek*. The first is *Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540 (4th Cir. 2005).[3] In *Hill*, this Court examined the enforceability of an arbitration agreement under Maryland law. There, an employee suing her employer had previously signed a separate arbitration agreement consisting of a six-page document detailing both parties' arbitration obligations. *Id.* at 542. We noted that under Maryland law, a court examining "whether an arbitration agreement is a valid contract" is limited to "the language of the arbitration agreement itself." *Id.* at 543. Because the arbitration agreement was a separate contract, however, we did not confront the specific issue of what to do when an arbitration agreement is contained within a larger contract. Rather, we held that the district court erred in looking outside the arbitration agreement to an "internal dispute solution" program that the employer reserved the right to change without notice; because the arbitration agreement itself clearly bound both parties to arbitration, it was supported by adequate consideration. *Id.* at 543-44.

The second Fourth Circuit case that cites *Cheek* is *Dan Ryan Builders, Inc. v. Nelson*, 682 F.3d 327 (4th Cir. 2012), a case involving facts strikingly similar to those Plaintiffs have alleged here. In *Dan Ryan Builders*, the defendant builder constructed a new home in West Virginia for the plaintiff buyer. The contract contained an arbitration provision purportedly binding both parties, but giving the builder "the right to seek arbitration *or* to file an action for damages if [the buyer] 'fail[ed] to settle on the Property within the time required under [the] Agreement.'" *Id.* at 327 (emphasis in original, first alteration added). The buyer sued, arguing "that

---

[3]Inexplicably, Toll Brothers fails to cite *Hill* in either its opening or reply brief. Given the fact that *Hill* is one of only two published Fourth Circuit cases to cite *Cheek*, this failure is glaring.

the arbitration provision was unenforceable as a matter of law because it was not supported by mutual consideration, notwithstanding the fact that the contract as a whole was supported by adequate consideration." *Id.* at 328. The district court agreed and dismissed the builder's motion to compel arbitration. *Id.* Because "the parties' contract [was] governed by West Virginia law," and there was no West Virginia law directly controlling, this Court certified the following question to the West Virginia Supreme Court of Appeals: "Does West Virginia law require that an arbitration provision, which appears as a single clause in a multi-clause contract, itself be supported by mutual consideration when the contract as a whole is supported by adequate consideration?" *Id.* at 327.[4] Relevant here, however, is this Court's assumption that state law was controlling on the issue of whether the consideration underlying the contract could support an arbitration provision.[5] *See also infra* pp. 22-23 & n.7.

In the face of clear Maryland law that consideration for an arbitration provision must be in the provision itself, Toll Brothers argues that we may look outside that provision. Its arguments are not persuasive. First, Toll Brothers cites a

---

[4]The West Virginia court later answered this question in the negative, holding that "West Virginia's law of contract formation only requires that a contract as a whole be supported by adequate consideration." *Dan Ryan Builders, Inc. v. Nelson*, No. 12-0592, ___ S.E.2d ___, 2012 WL 5834590, at *2 (W. Va. Nov. 15, 2012). The West Virginia court also noted, however, that mutuality of obligation may be considered as a factor in unconscionability analysis. *Id.* at *7. In light of the West Virginia court's conclusions, the *Dan Ryan Builders* Court recently vacated the district court's holding as to mutuality, and remanded for further proceedings as to unconscionability. *Dan Ryan Builders, Inc. v. Nelson*, No. 11-1215, 2013 WL 323284 (4th Cir. Jan. 29, 2013).

[5]*Dan Ryan Builders* also discussed the unpublished case of *Howard v. King's Crossing, Inc.*, 264 F. App'x 345 (4th Cir. 2008) (per curiam), which Plaintiffs cite and the district court relied on. Of course, *Howard* was an unpublished—and therefore nonprecedential—opinion, and nothing the *Dan Ryan Builders* Court said about it (and nothing we might say about it here) would elevate its holding to binding precedent.

string of cases that it claims have rejected challenges to arbitration clauses on mutuality grounds where the underlying contract is supported by adequate consideration. But, as Plaintiffs point out, all of those cases are based on the law of states other than Maryland. Because the relevant inquiry depends on Maryland law, cases based on the law of other states are inapposite.

Second, Toll Brothers cites an unpublished district court opinion from New Jersey, *Arakelian v. N.C. Country Club Estates Limited Partnership*, 2009 WL 4981479 (D.N.J. Dec. 18, 2009), that enforced an arbitration provision contained in an agreement with Toll Brothers similar to the provision at issue here. Not only does *Arakelian* apply North Carolina law, however, but it does not even examine the issue of consideration, instead focusing its analysis on the plaintiffs' unconscionability argument and which Toll Brothers subsidiaries were bound by the arbitration provision. 2009 WL 4981479, at *7-*13. The reasoning in that case is similarly inapposite.

In short, we apply Maryland law to determine the validity of the arbitration provision in the Agreement. Under Maryland law as articulated in *Cheek*, an arbitration provision must be supported by consideration independent of the contract underlying it, namely, mutual obligation. Under Maryland law, therefore, the validity of the arbitration provision in the Agreement drafted and employed by Toll Brothers must satisfy that requirement, an issue to which we now turn.

2.

Toll Brothers' first fallback argument is that the arbitration provision is supported by consideration within the provision itself because it binds both parties to arbitration. Plaintiffs argue, and the district court held, that the clause binds only Plaintiffs. The arbitration provision reads as follows:

> 13. ARBITRATION: Buyer, on behalf of Buyer, and all permanent residents on the Premises, including

minor children, hereby agree that any and all disputes with Seller, Seller's parent company or their subsidiaries or affiliates arising out of the Premises, this Agreement, the Home Warranty, any other agreements, communications or dealings involving Buyer, or the construction or condition of the Premises including, but not limited to, disputes concerning breach of contract, express and implied warranties, personal injuries and/or illness, mold related claims, representations and/or omissions by Seller, on-site and off-site conditions and all other torts and statutory causes of action ("Claims") shall be resolved by binding arbitration in accordance with the rules and procedures of Construction Arbitration Services, Inc. ("CAS") or its successor or an equivalent organization mutually agreed upon by the parties. If CAS is unable to arbitrate a particular claim, then that claim shall be resolved by binding arbitration pursuant to the Construction Rules of Arbitration of the American Arbitration Association or its successor or an equivalent organization mutually agreed upon by the parties. In addition, Buyer agrees that Buyer may not initiate any arbitration proceeding for any Claim(s) unless and until Buyer has first given Seller specific written notice of each claim (at 250 Gibraltar Road, Horsham, PA 19044, Attn: Warranty Dispute Resolution) and given Seller a reasonable opportunity after such notice to cure any default, including the repair of the Premises in accordance with the Home Warranty. The provisions of this paragraph shall be governed by the provisions of the Federal Arbitration Act, 9 U.S.C. §§ 1, et seq. and shall survive settlement.

**BUYER HEREBY WAIVES THE RIGHT TO A PROCEEDING IN A COURT OF LAW (INCLUDING WITHOUT LIMITATION A TRIAL BY JURY) FOR ANY CLAIMS OR**

**COUNTERCLAIMS BROUGHT PURSUANT TO THIS AGREEMENT. THE PROVISIONS OF THIS SECTION SHALL SURVIVE SET-TLEMENT.**

J.A. 51 (emphasis in original). In the district court's view, this provision is "quite simply one-sided and onerous" because it

> mandates that buyers, or in this case Plaintiffs, promise to (1) submit all disputes against seller to binding arbitration, (2) notify Defendants of each claim before they initiate arbitration proceedings, (3) give Defendants a reasonable opportunity to cure the default, and (4) waive the right to proceed in a court of law. . . . Conversely, Defendants do not make any promises to Plaintiffs in this provision. The clause does not state "Buyer and Seller," or even "the parties" and thus does not impose any obligations on the Defendants. It only refers to "Buyers" and their obligations.

*Noohi*, 2012 WL 273891, at *6.

Toll Brothers disagrees with the district court's interpretation of the provision. In Toll Brothers' view, the provision

> provides that "Buyer . . . hereby agree[s] that any and all disputes with Seller . . . shall be resolved by binding arbitration[.]" The arbitration provision does not apply only to "Buyer's disputes" or disputes "against Seller." Rather, it applies to "any and all disputes" and disputes "with Seller." The Agreement of Sale does not state that disputes initiated by Seller will be in a court of law or that disputes raised by Seller will be treated differently. It states that "any and all disputes with Seller" will be resolved in arbitration. When Seller signed the Agreement of Sale, it agreed to be bound by this provision.

Toll Brothers' Br. 13 (alterations in original; citation to J.A. omitted).

We agree with the district court that the provision binds only Plaintiffs to arbitration, and thus lacks mutuality of consideration. First, as Plaintiffs point out, all the subject and verb pairings relate to the buyer's obligations (i.e., buyer agrees, buyer waives, etc.); nowhere does the provision state that "Buyer and Seller agree," or the passive "it is agreed." Second, the provision adds additional procedures that only the buyer must perform prior to initiating arbitration, such as giving the seller written notice of each claim and an opportunity to cure any default. Third, all the types of claims given as examples in the provision are claims that the buyer would bring against the seller. Fourth, the capitalized, bolded paragraph at the end of the provision states that only the buyer, but not the seller, waives the right to a court proceeding "FOR ANY CLAIMS *OR COUNTERCLAIMS* BROUGHT PURSU-ANT TO THIS AGREEMENT." J.A. 51 (emphasis added). This provision "expressly contemplat[es] that [court] claims could be brought by Seller (which would be a necessary prerequisite to Buyer's assertion of a counterclaim) but that even in such an event, and even though Seller may bring the claim in court, Buyer may not assert any counterclaim in that forum." Pls.' Br. 27. These interpretive guides, rooted as they are in reasonable and longstanding grammatical, linguistic and "plain language" principles, make clear that the provision did not bind Toll Brothers to arbitration.

Because the arbitration provision unambiguously binds only the buyer, there is no ambiguity to interpret by application of a presumption in favor of arbitration.[6]

---

[6]Even if there were an ambiguity, however, the presumption in favor of arbitration does not apply to questions of an arbitration provision's validity, rather than its scope. *Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 130 S. Ct. 2847, 2857-58 (2010) (explaining that the presumption in favor of arbitrability does not apply where there are questions as to the enforceability of the arbitration agreement). *See also Gove v. Career Sys. Dev. Corp.*, 689 F.3d 1, 6 n. 2 (1st Cir. 2012) ("However, this presumption of arbitrability applies only to the scope of an arbitration agreement, not its validity.").

### 3.

Toll Brothers' second fallback argument attempts to distinguish *Cheek* on its facts, pointing out that the arbitration provision in *Cheek* was illusory because one party could revoke its promise to arbitrate at any time, whereas the issue here is whether one party has bound itself at all. This argument warrants little discussion, as the distinction Toll Brothers draws is one without a difference; the point is that in both cases, the "agreement" is illusory and lacks consideration. Similarly, Toll Brothers' reliance on *Holloman v. Circuit City Stores, Inc.*, 894 A.2d 547 (Md. 2006), does not further its argument. That case held that the *Cheek* rule did not apply where an arbitration agreement permitted one party to modify the agreement on 30 days' notice, among various other restrictions on altering the agreement. *Id.* at 592. Unlike in *Holloman*, the issue here is the same as in *Cheek*—whether the arbitration agreement is supported by any consideration at all.

### 4.

Toll Brothers' final fallback argument is that the *Cheek* rule is preempted by the FAA.

The Supremacy Clause provides, in relevant part, that "the Laws of the United States . . . shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. A state law that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" is preempted by the Supremacy Clause. *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). *See also Concepcion*, 131 S. Ct. at 1753.

In *Concepcion*, 131 S. Ct. at 1740, the Court held that the FAA preempted California's judicial rule (known as the *Discover Bank* rule) regarding the unconscionability of class arbitration waivers in consumer contracts. Under the *Discover Bank* rule, class waivers in consumer arbitration agreements were deemed unconscionable if (1) the waiver was in an adhe-

sion contract, (2) disputes between the parties would likely have involved small amounts of damages, and (3) the party with inferior bargaining power alleged a deliberate scheme to defraud. *Id.* at 1746. In concluding that the FAA preempted that rule, the Court's analysis focused on the ways in which classwide procedures interfere with the informality of arbitration—one of its chief benefits—as well as on the increased risks to defendants. *Id.* at 1751-52.

But the *Cheek* rule neither increases formality nor risks to defendants; it merely requires that for an arbitration provision to be valid, both parties bind themselves to it. The primary concerns underlying *Concepcion* are therefore inapplicable here.

It is true that the Court in *Concepcion* was also concerned with ensuring, in general terms, that arbitration agreements are enforceable as written, including "*with whom* a party will arbitrate its disputes." *Id.* at 1748-49 (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1773 (2010) (emphasis in original)). But both *Concepcion* and *Stolt-Nielsen* involved issues of classwide arbitration; when the Court stated that parties may specify "with whom" they choose to arbitrate, the point was that they may, under the FAA, choose to arbitrate with an *individual* rather than a *class*. The Supreme Court has never held that the FAA pre-empts state law rules requiring that arbitration provisions themselves contain consideration (i.e., that they not be illusory), and it would require a substantial extension of existing precedent to do so here.

Perhaps, Toll Brothers' strongest contention is that the *Cheek* rule "imposes a requirement on arbitration clauses (mutuality within the clause itself) that does not apply to other contract clauses." Reply Br. 4. This contention properly gives us pause. The Supreme Court has long held that "[c]ourts may not . . . invalidate arbitration agreements under state laws applicable *only* to arbitration provisions." *Doctor's Asso-*

*ciates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) (emphasis in original). The Court has explained that "[b]y enacting § 2, . . . Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed 'upon the same footing as other contracts.'" *Id.* (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974)).

In a basic sense, the *Cheek* rule does single out an arbitration provision in a larger contract, and assess whether that provision binds both parties to arbitrate at least some claims. But on closer inspection, we are persuaded that all *Cheek* does is treat an arbitration provision like any stand-alone contract, requiring consideration. Lack of consideration is clearly a generally applicable contract defense. The *Cheek* rule does not bar the arbitration of entire categories of claims. *See Marmet Health Care Ctr., Inc. v. Brown*, 132 S. Ct. 1201 (2012) (per curiam) (holding that West Virginia's prohibition against predispute agreements to arbitrate personal-injury or wrongful-death claims against nursing homes was preempted by the FAA). Nor does it ignore an arbitration provision to gauge the enforceability of a different provision within the same contract. *See Nitro-Lift Technologies, L.L.C. v. Howard*, 133 S. Ct. 500 (2012) (per curiam) (reversing, as inconsistent with the FAA, the Oklahoma Supreme Court's invalidation of a noncompetition agreement on public policy grounds, where that agreement contained a valid arbitration clause).

Moreover, we are not persuaded that *Cheek* disfavors arbitration; *Cheek* can just as readily be viewed as *encouraging* arbitration by requiring that both parties to an arbitration agreement bind themselves to arbitrate at least some categories of claims.

In any event, this Court has recognized *Cheek*'s vitality as recently as this year, noting that "[u]nder Maryland contract law, an arbitration provision must contain a mutually coextensive exchange of promises to arbitrate, regardless whether the

contract as a whole is supported by adequate consideration." *Dan Ryan Builders*, 682 F.3d at 329-30 (citing *Cheek*, 835 A.2d at 665).[7] In *Hill*, a 2005 case, this Court applied *Cheek* to *uphold* an arbitration agreement, holding that the agreement itself bound both parties to at least some claims, and it was error to look outside the agreement to invalidate it. 412 F.3d at 543-44. Neither case questioned whether *Cheek* was preempted by longstanding Supreme Court precedent.

## C.

We note here the gravity of the issue presented. Toll Brothers asks us to overturn a decision of the high court of one of the 50 states—relying on our Constitution's Supremacy

---

[7]Indeed, we may be bound by circuit precedent to reject Toll Brothers' preemption contention. In *Dan Ryan Builders*, the homebuilder-appellant argued vigorously to this Court that a rule such as Maryland's mutuality of obligation requirement for arbitration provisions in a multi-provision contract was flatly preempted under the FAA. *See, e.g.*, Dan Ryan Builders' Reply Br. 1 ("It Is Irrelevant Whether State Law Would Require Mutuality of Obligation in an Arbitration Provision Contained Within a Larger Contract Which Is Supported by Mutual Consideration. Federal Law Imposes No Such Requirement and Preempts Conflicting State Law."). Accordingly, the *Dan Ryan Builders* Court clearly had before it for consideration the question of whether mutuality of obligation was the kind of state law principle that survives the preemptive force of the FAA. This Court effectively rejected the preemption argument by addressing *Marmet*, determining that it was not controlling, and thereafter certifying to the Supreme Court of Appeals of West Virginia the question of whether West Virginia requires mutuality of obligation in an arbitration provision that is a part of a larger contract. *See Dan Ryan Builders*, 682 F.3d at 328-30. "A federal court's certification of a question of state law to that state's highest court is appropriate when the federal tribunal is required to address *a novel issue of local law which is determinative in the case before it*." *Grattan v. Bd. of Sch. Commissioners of Baltimore City*, 805 F.2d 1160, 1164 (4th Cir. 1986) (emphasis added; citation omitted). In short, had the *Dan Ryan Builders* panel perceived any merit in the homebuilder-appellant's preemption contention, it would not have certified the question of the arbitration provision's enforceability to the Supreme Court of Appeals of West Virginia—particularly not in a case in federal court on the basis of diversity jurisdiction.

Clause—despite the fact that the United States Supreme Court has never held that Congress, in enacting the FAA, intended to preempt states from requiring mutual consideration in an arbitration provision. This we decline to do. The Supreme Court may eventually hold that the FAA preempts such a rule, but doing so now would require an extension of existing precedent—and abrogation of our own. We also note that Toll Brothers could easily have avoided this serious constitutional question—one implicating federalism and state sovereignty, as well as the constitutional right to a jury trial—by adding just a few words to the arbitration provision,[8] binding itself to arbitration in the way it now contends it intended all along.[9] *See supra* p. 16-19 (describing Toll Brothers' "first fallback argument").

### IV.

For the reasons set forth, we conclude that this Court has jurisdiction over Toll Brothers' appeal, and that the district court correctly held that the arbitration provision was unenforceable for lack of mutual consideration. The judgment of the district court is therefore

*AFFIRMED*.

---

[8]Further, the Agreement's numerous references to Maryland law refute Toll Brothers' counsel's assertion at oral argument that, in his understanding, "the contract is in fact a uniform contract" all over the country. Toll Brothers clearly took into account some Maryland law when drafting the Agreement; it simply neglected to take into account other Maryland law, as articulated in *Cheek*, by including consideration within the arbitration provision.

[9]Because we conclude that the arbitration provision in the Agreement lacks validity under Maryland law, we do not reach Plaintiffs' alternative arguments.